STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. IRV-
ING LABELL, ANNE BERGASIN, LOUIS A. MacFARLAND,
RAYMOND WELLS, JR., EMORY CHEESMAN AND WIL-
LIAM D. MARREN, PLAINTIFFS IN ERROR.

Submitted October 1, 1946—Decided April 7, 1947.

Before CASE, CHIEF JUSTICE, and Justices HEHER and
COLIE.

For the defendant in error, *Walter D. Van Riper,* Attorney-
General, and *John Grimshaw, Jr.,* Deputy Attorney-General.

For the plaintiffs in error, *Samuel P. Orlando, Frank I.
Casey* and *Carl Kisselman.*

The opinion of the court was delivered by

CASE, CHIEF JUSTICE. The persons enumerated above as
plaintiffs in error were indicted by a Burlington County grand
jury on a charge of conspiring to cheat and defraud the
County of Burlington with respect to providing the county

with steel for road and bridge purposes and erroneously and fraudulently billing or vouchering the invoices for payment. Labell and Bergasin were connected with the Merit Steel Company which sold the material to the county and were severed from the indictment for the purposes of the trial. MacFarland, Wells, Cheesman and Marren were tried and convicted and prosecute this writ of error to review the conviction. They will be referred to herein as defendants.

There was competent evidence from which, and its legitimate inferences, a factual finding as follows could be reached: The defendants were employed in the road department by the County of Burlington, MacFarland as supervisor of roads and bridges, and, subordinate to him, Wells as chief clerk, Cheesman as principal clerk under Wells and Marren as yard master. MacFarland began to work for the county in 1917, became supervisor in 1929 and, except for an interruption between 1935 and 1938, continued to serve in that capacity until his dismissal in 1946. He was the effective head of the road department. He purchased materials upon his own authority, selected the firms from whom purchases were to be made and passed upon prices. He was politically active and at times impressed his authority and influence upon the Board of Chosen Freeholders or the members thereof. Wells began his employment by the county in 1930, was made chief clerk of the department, second in command to MacFarland, in 1933 and continued in that position with an interval of about three years from 1935 to 1938 until 1946 when he was discharged. In MacFarland's absence Wells was in charge. Cheesman and Marren had worked for the county in their respective capacities for seven years prior to their dismissals.

The method of ordering and accepting the materials and vouchering the invoices for payment was that when steel was needed for the department Marren would make out a requisition in triplicate, one copy being retained by him and two copies being sent to the office; at the office Cheesman or Wells would submit the requisition to MacFarland who would approve it and designate the name of the person or firm by whom the order was to be filled; a purchase order was then

made out, one copy of which went to the vendor and one was retained for the files of the office; the requisition was returned to Marren. · When the steel came in, Marren would check the delivery against the requisition and enter the details of the shipment in a ledger. The bill or voucher went first to Marren who checked the same against the requisition and ledger entries and also checked the reasonableness of the price appearing on the voucher. He then checked the voucher and sent it to the office with the requisition. At the office Cheesman checked the voucher against the requisition and the order, saw that a proper number was endorsed on the voucher and initialed the voucher. Thereupon the voucher, the requisition and the order went to Wells who rechecked, including a check as to price to make sure that the price was not exorbitant. The documents were then placed in the hands of MacFarland who checked the same and placed the voucher in channel for payment by the county. With one irrelevant exception all of the steel purchased for the county road department during the period covered by the indictment was bought from Irving Labell who operated under the name of Merit Steel Company. That company was a jobber. It did not fabricate steel. The steel which it furnished Burlington County was purchased from standard steel companies. No bids were ever solicited for steel orders. When an order exceeded $1,000 in amount, the voucher would be so divided that no single voucher exceeded that statutory figure. The defendants all knew of that practice and also knew that Labell through his Merit Steel Company received all of the orders without a call for bids. The Board of Chosen Freeholders became suspicious and caused an accountant to make an examination which disclosed the facts. The County of Burlington was paying to the Merit Steel Company around 60 cents per pound for steel which could be bought in the open market for approximately 4 cents per pound. In 1938 Labell was a salesman for the Vulcan Steel Company and succeeded in opening up business with MacFarland as county supervisor. Ultimately, Labell formed his own company. By 1943 MacFarland was buying from that company all of the steel used

by the county. That steel was ordinary steel, ordered, shipped and received as such; but the bills when they came in bore a mark indicating some specialty; as instances, angle iron was billed as "Meritex 680" and soft flat steel was billed as "Meritex Special Steel." But those markings had no significance to the trade by way of indicating quality, type or price of steel; they were apparently a cover to mislead the ordinary observer into thinking that there was a reason for billing prices excessively above the market. It was plainly within the defendants' observation that the goods thus billed as specialties were not ordered by such designations. In two illustrative cases the steel was traced from the time of its purchase by Merit from a standard steel company (Dodwell & Co. of New York City in one instance and Jones & Laughlin in the other) to its delivery to Burlington County. One order called for six pieces of angle iron $2'' \times 2'' \times \frac{1}{4}'' \times 20'$; the material was purchased by Merit Steel Company from Dodwell & Co. for $38.28, was shipped by the manufacturer to Burlington County but was billed by Merit Steel Company to the county at $470.40. Two further vouchers (the total was more than $1,000) were for an aggregate of 1,977 pounds of steel which was purchased by Merit Steel Company from Jones & Laughlin and shipped by the latter to the County of Burlington at a charge from Jones & Laughlin to the Merit Steel Company of $75.67, and was rebilled by Merit Steel Company to the County of Burlington at $1,186.20. It was MacFarland's duty to know fair prices; and he held himself out as knowing them. So, in lesser degree, as to the other defendants except Cheesman. Even as to Cheesman, the pattern of events, running through his extended experience of seven years in checking vouchers, orders and requisitions, with the character of the billings and other circumstances, presented a jury question about his knowledge and conscious participation in the fraud.

The case comes up on certification of the entire record and proceedings.

Basing their argument upon the court's refusal to direct verdicts of not guilty, the defendants first contend that there

was insufficient evidence either at the close of the state's case or at the close of the entire trial to submit the cause to the jury. We think that references already made to the proofs are sufficient to indicate that the question of guilt or innocence was for the jury.

It is next said that the verdict of the jury was clearly against the weight of the evidence produced in the case at the trial and was the result of passion, prejudice, mistake and partiality. To give effect to this point it is necessary that the second branch of it should be true in order to sustain the first. The weight of the evidence must so clearly appear in favor of the defendants as to give rise to the inference that the verdict of guilt is the result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546. The point is not sustained.

Defendants further complain that the trial court erred in refusing a requested charge to the jury upon the effect of circumstantial evidence. The court charged on this subject as follows:

"And here I must call your attention to the principal which must govern you in passing on the effect of circumstantial evidence. An accused may be convicted on circumstantial evidence provided, first, the facts sworn to are satisfactorily proved, that is, beyond a reasonable doubt. In the next place, the further inquiry arises whether the facts proved are explained or explainable on any other rational conclusion than that the prisoner is guilty. If not so explainable, they are sufficient to warrant a conviction. If so explainable, no conviction upon them alone is possible. In this regard, you, of course, will disregard such testimony of any witness, either defendant or state, as you do not believe; you will consider, naturally, in reaching your final conclusion the testimony that you do believe."

The court also charged:

"There are, of course, certain general principles of law which apply in this case, as in every criminal case. The first of these principles is that the law presumes each defendant to be innocent, and this presumption continues as a presump-

tion throughout the entire case until overcome by the state by evidence establishing his guilt beyond a reasonable doubt. This burden, as I say, remains upon the state throughout the case. The state will have met this burden only if, after you have considered the entire evidence in the case, you feel an abiding conviction to a moral certainty of the truth of the state's charge."

We consider that the charge met the requirements stated by the Court of Errors and Appeals in *State* v. *Kuehnle,* 85 *N. J. L.* 220, as against the form of request which the defendants submitted. A trial judge when stating the legal rule called for is not required to adopt either the form or the words or the collocation of phrases in which the request to charge is framed. *Costanza* v. *Cavanaugh,* 131 *Id.* 175.

Defendants complain of the admission into evidence of *Exhibits S-8* to *S-21* inclusive. Those exhibits were small pieces of steel material which, on February 27th, 1945, were taken from the yard over which Marren presided and in his presence. The effort was to take representative samples of the pieces of steel then in the yard—a sample of each size; angle irons, bars, and the like, structural iron steel of the type and quality called for by some of the orders in evidence. It was otherwise in proof that after July 1st, 1944, when a committee of the board took over, no steel had been purchased; that from 1942 no steel except one order of a type not here involved had been bought other than from the Merit Steel Company; and that the warehouse price of steel of the character of the exhibits during four years preceding June, 1946, was 3.8 cents per pound. One of the samples was an angle iron $2'' \times 2'' \times \frac{1}{4}''$, actually identified as a product of Jones & Laughlin Steel Company; base price, warehouse, 3.622 cents to 4.503 cents per pound. The trial court admitted the exhibits in evidence upon the theory that the road department had carried a stock reasonably commensurate with the needs of the county, that the specimens made visible to the jury the sort of goods that were the subject of inquiry and that the cost of common steel, such as the exhibits were and such as the placed orders called for, was corroborative. We find no error in the ruling.

Another alleged error is that Marren, put on the stand as a witness in his own behalf, having been cross-examined by the state and being at the time under cross-examination by another defendant, was not permitted to answer the question whether some of the steel that had been in the yard when the witness went there in 1938 was still there when he quit in 1946. The question was not proper cross-examination upon any matter that was brought out either on the direct examination or on the earlier cross-examination.

Finally, defendants extract a sentence from the charge and impute to it a meaning which, considered with its context, it clearly did not have.

The judgment will be affirmed.